697 A.2d 201

TOLL BROTHERS, INC., A DELAWARE CORPORATION, PLAINTIFF, v. TOWNSHIP OF WEST WINDSOR, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY LOCATED IN MERCER COUNTY, NEW JERSEY, THE TOWNSHIP COMMITTEE OF THE TOWNSHIP OF WEST WINDSOR, AND THE PLANNING BOARD OF THE TOWNSHIP OF WEST WINDSOR, DEFENDANTS.

Superior Court of New Jersey
Law Division

October 16, 1996.

522

*Henry A. Hill* and *Carl S. Bisgaier*, for plaintiff (*Hill Wallach* attorneys; *Flaster, Greenberg, Wallenstein, Roderick, Spirgel, Zuckerman, Skinner & Kirchner*, attorneys; *Mr. Hill, Mr. Bisgaier* and *Stephen M. Eisdorfer*, on the brief).

*Eric M. Bernstein*, for defendants, Township of West Windsor and The Township Committee of the Township of West Windsor (*Weiner, Lesniak*, attorneys).

*Gerald J. Muller*, for defendant, The Planning Board of the Township of West Windsor (*Miller, Porter & Muller*, attorneys).

CARCHMAN, A.J.S.C.

In 1973, the Supreme Court of New Jersey recognized the constitutional principle that requires municipalities to open their doors to families of all income levels, thereby barring the use of exclusionary zoning. To implement this mandate, first the courts and then the Legislature established a procedure to identify for each municipality, that number of housing units which represent its "fair share" of low and moderate housing. The test for compliance was stated simply—provide developers with a realistic opportunity to construct housing for low and moderate income families. In 1985, West Windsor Township's fair share of low and moderate income housing was determined to be 592 dwelling units. In 1994, that number was increased to 929 units.

From 1982 to 1992, the number of houses in West Windsor Township more than doubled, increasing from 2,907 units to 6,115 units. As West Windsor Township experienced and enjoyed this enormous growth, new residents moving into West Windsor Township generally purchased high-priced, large-lot, single-family houses.

West Windsor's housing boom was not shared by all. Of 3,208 new homes built in West Windsor, the total number of constitutionally mandated affordable units constructed was 139.

I.

This is an exclusionary zoning case brought pursuant to *Southern Burlington Cty. NAACP v. Mount Laurel Tp.*, 67 *N.J.* 151, 336 *A.2d* 713 (1975) (*Mount Laurel I*) and *Southern Burlington Cty. NAACP v. Mount Laurel Tp.*, 92 *N.J.* 158, 456 *A.2d* 390 (1983) (*Mount Laurel II*). Plaintiff Toll Brothers (hereinafter "Toll" or "plaintiff"), is a large housing developer and owner of a 293–acre tract of land in West Windsor Township. Defendants are the Township of West Windsor, the Township Committee of the Township of West Windsor and the West Windsor Planning Board (hereinafter referred to collectively as West Windsor, the Township, or defendant). Plaintiff alleges that defendant has been engaged in a pattern of exclusionary zoning in violation of the New Jersey Constitution as interpreted in the *Mount Laurel* cases, and the Fair Housing Act of New Jersey, *N.J.S.A.* 52:27D–301 through –329 (hereinafter "the Act"). Plaintiff makes this assertion, notwithstanding the fact that plaintiff's own property is currently zoned for townhouses, garden apartments, patio homes, two-family rentals, maisonettes and zero lot-line single-family units, and that defendant continues to implement a plan approved by this court in 1985. Plaintiff seeks a site-specific builder's remedy—the rezoning of its property to permit the construction of 625 to 650 conventional single-family detached houses on relatively

small lots in addition to 110 to 115 low and moderate income housing units.

This case represents a fully litigated "second-round" exclusionary zoning case. This court is called upon to address for the first time the continuing constitutionality of an inclusionary housing plan approved by a court under the standards established in *Mount Laurel II*, but which has produced little affordable housing during the past ten years. Because this is the first time a court must rule upon the validity of a municipality's compliance plan in a "second round" ten years after compliance was previously achieved, many issues are raised, some of which are novel.

Among the significant issues raised, this court must consider the exclusionary effect of municipal policies concerning the construction of sewer systems. Plaintiff alleges that certain of defendant's policies concerning sewers preclude development in many of defendant's inclusionary zones. Specifically, plaintiff attacks municipal policies requiring that all sewers be constructed as gravity flow systems (rather than systems using pumps), as well as municipal policies that require the first developer to "front" the entire cost of constructing a collector system that will serve not only this development, but all future development in that area of the municipality, and bear the risk of never recovering those costs from other future developers.

Plaintiff also raises an issue as to the role of assemblage in a court's consideration of an inclusionary site and how a need to assemble various owners' parcels impacts on the municipality's success in fulfilling its obligation to provide a realistic opportunity for inclusionary development.

This court is also called upon to consider the impact of environmental constraints, open space requirements and other zoning and planning considerations on the standard of "realistic opportunity" for development.

Historically, multi-family housing stock represents the product of choice for both developers and the courts to implement the *Mount Laurel* requirements. This case presents the issue of whether the use of multi-family housing as the model for meeting housing demand may be modified by the utilization of marketable

single-family dwellings as an alternative for satisfying the *Mount Laurel* requirement. This court must assess what type of zoning complies with the municipality's fair share housing obligation, based upon expert testimony as to the types of housing that the market is realistically likely to absorb coupled with an assessment of the "mix" permitted by defendant's ordinances.

Finally, this court must consider the fact that in the ten years between the initial fair share determination and the present time very little moderate and low income housing has been built. The court is called upon for the first time to determine which party has the burden of persuasion as to why the sites that are incorporated in both the "first" and "second" round and for which a municipality has previously received fair share credit have not been developed.

This court conducted an extended bench trial and considered the testimony and exhibits presented. For the reasons set forth below, this court concludes that defendant's zoning ordinances do not meet the constitutional requirements established in the *Mount Laurel* cases. To summarize this court's findings:

1) The marketability, and thus market demand for particular housing types, are factors that must be considered in determining whether a municipality has provided a realistic opportunity for the development of affordable housing. Appropriately sized and priced conventional single-family dwellings may provide an alternative to multi-family housing for the purpose of meeting housing demand to satisfy a municipality's fair share requirement;

2) Defendant's ordinances and policies regarding sewer financing and construction, which require inclusionary developers to "front-end" the costs of an oversized gravity-fed system, are factors that discourage inclusionary developers and diminish a realistic opportunity to develop inclusionary sites;

3) Inclusionary sites that require assemblage in order to comply with zoning ordinances and other municipal regulations should not be considered as sites providing a realistic opportunity for development of inclusionary housing;

4) Many of the sites zoned for inclusionary housing are so environmentally constrained or subject to open space or other requirements as to minimize their consideration as sites providing a realistic opportunity for development of inclusionary housing;

5) Where defendant received prior credit for inclusionary sites, and where so little inclusionary development has taken place over an extended period of time—here, ten years—despite significant development of the single-family housing market, the

burden of persuasion shifts to defendant to establish why previously approved sites have not been developed; and

6) As a result of market demand factors, site factors and the terms of defendant's ordinances and regulations, West Windsor's inclusionary housing plan does not create a realistic opportunity for the development of its fair share of affordable housing, and West Windsor is thus not in compliance with the *Mount Laurel* mandate.

What follows are the court's findings of fact and conclusions of law.

## II.

This is the second *Mount Laurel* suit initiated against defendant. On March 14, 1984, Affordable Living Corporation instituted exclusionary zoning litigation against defendant that resulted in a court order, entered on July 24, 1984, establishing defendant's fair share at 1,619 low and moderate income units. In October 1985, a judgment of compliance and repose resulting from a settlement was entered. *Affordable Living Corp. v. West Windsor Tp.*, No. L–17812–84 (Law Div. October 1, 1985). On October 14, 1986, the judgment of compliance was modified to conform West Windsor's fair share housing obligation to that established by the Council on Affordable Housing (hereinafter COAH)—592 units.

The judgment of compliance and the six-year period of special *res judicata* protection provided for in *Mount Laurel II* expired on July 21, 1991. Defendant elected not to apply for "interim certification" under COAH regulations, *N.J.A.C.* 5:92–1.6(d), 5:91–14, prior to the filing of this litigation.[1] Toll filed the complaint in the present action on May 12, 1993. At the time this litigation was commenced, defendant was not protected by either a judgment of compliance or substantive certification granted by

---

[1] "Interim certification" would have required the municipality to continue implementing terms of the prior judgment of compliance until COAH established housing obligations for the 1993–99 period and would have provided the municipality with a form of protection from further litigation. *N.J.A.C.* 5:92–1.6(d); 5:91–14.

COAH. The matter proceeded to trial on September 28, 1994, and concluded March 29, 1995.[2]

Defendant's present fair share housing obligation was established by COAH in regulations that were first proposed on March 15, 1993, 25 *N.J.R.* 118 (March 15, 1993), and finally adopted on June 6, 1994, 26 *N.J.R.* 2300 (June 6, 1994). This court is bound by that COAH finding and determination. *Hills Dev. Co. v. Bernards Tp.*, 103 *N.J.* 1, 63, 510 *A.2d* 621 (1986). Under these regulations, defendant's obligation is 929 units of affordable housing.

Defendant's obligation consists of two components. Thirty units comprise the housing needed to meet the needs of defendant's indigenous poor. Defendant, as any municipality, can satisfy this portion of its obligation either through rehabilitation of existing physically substandard housing that is occupied by low and moderate income households or by creating *realistic opportunities* for the construction of new housing reserved for low and moderate income families.

The remaining 899 units comprise the municipality's fair share of the unmet regional need for safe, decent housing affordable to low and moderate income households (variously referred to as the municipality's "present reallocated and prospective need" or the "new construction component" of its housing obligation).

▪ In determining whether zoning ordinances and housing plans create a realistic opportunity to satisfy defendant's fair share housing obligation, the court must assess the extent to

---

[2] Defendant recently renewed a motion to reopen the record with the aim of updating the record as to certain sites where inclusionary development now seems more likely than at the time of trial. Although the court is pleased to see some measure of success emerging from defendant's affordable housing program, the posture of the case and consideration of the equities compels denial of both this and the earlier motion. Plaintiff challenges the *bona fides* of various aspects of the asserted new record. At some point the record must close. Any post-trial developments are appropriate for consideration during the remaining phases of this matter.

which the municipality has created realistic housing opportunities at two different points in time. For the purpose of determining whether Toll is entitled to a site-specific builder's remedy, defendant's conduct must be assessed at the point before it began amending its ordinances in response to this litigation. For the purpose of determining whether other relief should be granted, defendant's conduct must be assessed at the close of trial, and in light of any builder's remedy awarded by the Court. *Van Dalen v. Washington Tp.*, 205 *N.J.Super.* 308, 334 n. 11, 500 *A.2d* 776 (Law Div.1984).[3]

In settlement of the prior *Affordable Living Corporation* suit in 1985, defendant formulated a plan to create affordable housing by zoning eleven sites for inclusionary development and by rehabilitating existing physically substandard housing. This plan remained in effect, essentially unchanged, until late summer 1994. Since 1985, only 139 low and moderate income units have been constructed on these various inclusionary sites.[4] These units are located in two developments:

1) Windsor Haven (for-sale condos): 37 units
2) Steward's Watch (rental apartments): 102 units.

Under COAH regulations municipalities are obligated to meet twenty-five percent of their fair share housing obligation through rental housing and are entitled to certain bonus credits for rental units actually constructed or for which there is a firm commitment to develop—one additional credit for each unit of rental family

---

[3] Judge Skillman observed that given the Supreme Court's strong statement that builder's remedies should be more readily available, *Mount Laurel II, supra,* 92 *N.J.* at 279, 456 *A.2d* 390, a plaintiff may argue for such a remedy even where ordinances passed during the pendency of the action have brought the municipality into compliance.

[4] Defendant claims credit for a third development—a third-bedroom group home housing five handicapped persons created by the rehabilitation of an existing residence prior to 1984. Under COAH regulations, however, a municipality is entitled to credit for rehabilitated units only if rehabilitated since 1990. *N.J.A.C.* 5:93–3.4. All prior rehabilitation is already taken into account in the municipality's fair share housing obligation.

housing and one-third of a credit for each unit of rental senior citizen housing. *N.J.A.C.* 5:93–5.14. Defendant earned 102 rental bonus credits for the Steward's Watch development. With the addition of these bonus credits, defendant has met 241 units of its 929–unit fair share housing obligation. As of September 1994, defendant's sole means of meeting the balance of its obligation was the inclusionary zoning of nine remaining sites.

After applying credits for the constructed units and rental bonus, defendant's remaining unmet fair share obligation in this second-cycle compliance program is 688 low and moderate income units. To be adjudged in compliance with *Mount Laurel II,* defendant must show that its inclusionary zoning provides a *realistic opportunity* for the construction of 688 additional affordable units.

Defendant's response to its constitutional obligations has been less than startling. While two additional inclusionary sites have been created during the course of this litigation, defendant's actions, or rather lack thereof, raise significant questions as to its commitment to fulfill its mandated responsibility.

For example, although defendant in 1985, requested and received three years to implement a housing rehabilitation plan and represented to the first *Mount Laurel* trial court that it would either float a township bond for $550,000, seek a grant from a county-wide bond issue, apply for grants, or use some combination of all of these vehicles, to rehabilitate units, no rehabilitation initiative was pursued until the prior judgment of repose lapsed and this litigation began.

During trial, defendant presented evidence that it had recently taken steps to apply for funds from the state or county to establish a rehabilitation program, but had not yet been granted any such funds and had not itself appropriated funds to establish such a program.

According to defendant's proposed *Mount Laurel II* compliance program, filed with the court prior to entry of the 1985 Judgment

of Repose, defendant proposed to rehabilitate a total of thirty-seven dwelling units designated as deficient in the 1980 census, and rezone a total of eleven sites that were said to provide a realistic opportunity for the production of 1,306 low and moderate income units. This inclusionary zoning plan, adopted in 1984, remained unchanged until after the commencement of the present litigation.

Under the initial compliance plan, plaintiff's property, Site 6, which is still undeveloped, was proposed as a realistically possible site for construction of a total of 2,480 family units plus 175 elderly housing units—it was designed to yield a total of 496 low and moderate income units. This site was by far the largest compliance site under single ownership in the original compliance plan.

A proposed amendment to the original compliance plan was reviewed by the Honorable Eugene Serpentelli, A.J.S.C., after settlement agreements were negotiated with respect to both Site 6 (plaintiff's site) and Site B (the Copperfield site), reducing the number of units to be built on those sites from 2,655 units to 1,500 in the case of Site 6, and from 1,032 units to 695 in the case of Sites B and 4, but the parties never received court approval for the proposed modifications.

By letter to Judge Serpentelli dated May 22, 1992, defendant took the position that the Countryside settlement, which allowed 1,500 multi-family units on Site 6, was *no longer viable given the market developments of the past few years and will likely be reconfigured*" (emphasis added). In this litigation, defendant took a contrary position and argued that 1,500 high-density multi-family units with a twenty percent affordable housing setaside constituted realistic inclusionary zoning.

Another example is relevant. On June 21, 1989, a development known as Maycho was granted preliminary approval by the defendant Planning Board for a total of twenty-eight condominium units. The zoning (R–3A) requires a twenty percent setaside. This development, which would yield six affordable units, was never built and has apparently been abandoned.

A strong and notable factor in this case is defendant's housing market as it has developed since the prior litigation. Over the past ten years, defendant has experienced enormous growth and a very strong housing market: from 1982 to 1992, defendant's housing stock more than doubled, increasing from 2,907 to 6,115 units. Despite the prior court order and defendant's attempts at inclusionary zoning, affordable units comprised only four percent of the units constructed during that period. The failure of affordable housing development over the past decade is inconsistent with defendant's booming housing market during that period.

Defendant's performance has also been poor as compared with all other suburban Mercer County municipalities and suburban municipalities in the Route 1 Corridor between Trenton and New Brunswick; as was developed at trial, defendant has the *lowest* rate of fair share development in *both* groups.

Plaintiff asserts that defendant's poor rate of *Mount Laurel* fulfillment was the result of a number of factors, including: 1) environmental constraints on the inclusionary sites; 2) public sewer policies; 3) public resistance and processing delays in the approval of inclusionary sites; and 4) unnecessary cost-generating requirements and restrictive zoning requirements imposing restraints on the market units within the inclusionary sites.

Summarizing plaintiff's position, this court notes the following:

1) *Environmental Constraints.* Plaintiff's argument is premised on the fact that lands zoned for affordable housing inclusionary development in defendant's first compliance plan were severely impacted by freshwater wetlands, freshwater wetlands buffers and floodplain areas. Using the New Jersey Department of Environmental Protection wetlands mapping and Federal Environmental Management Agency 100–year floodplain mapping, Philip Caton, plaintiff's planning expert, confirmed the wetland buffer lines shown by defendant's expert, John Madden, in his analysis of sites zoned for affordable housing in West Windsor as of April 1994. Caton pointed out that these findings not only decrease the quantity of buildable acreage, but also impact on the

feasibility of accessing this acreage with road and utility infrastructure. He claimed convincingly that the size and configuration of buildable acreage, coupled with the cost of extending infrastructure to it, diminished the likelihood of development of many sites. He further claimed, also convincingly, that a number of the inclusionary sites were so environmentally constrained and so limited in development capacity as to preclude any economically feasible recapture of infrastructure and development costs.

2) *Public Sewer Policy.* Plaintiff's expert Caton testified at length with respect to defendant's relevant sewer planning documents and sewer policies as they affected the development of all unsewered inclusionary sites along the Duck Pond Run Interceptor, one of the available intercepter lines serving West Windsor Township. He pointed out that defendant required that these sites be sewered by gravity flow systems through the extension of the Duck Pond Run Interceptor. These systems would need to be deep to permit gravity to work, and oversized to accommodate future development. Plaintiff argues convincingly that defendant's requirement that developers "front" the costs of such an expensive system without certainty of reimbursement discourages development of inclusionary sites.

3) *Public Resistance.* Caton opined that public resistance and processing delays contributed significantly to defendant's poor performance in developing low and moderate income housing since the last judgment. Caton testified that he had been the planner for CAP Associates, Toll's predecessor in title, and he described the history of prior applications to develop Site 6. An application began in May of 1981 when the Planning Board began holding hearings on the application of another predecessor in title, Maneely. The matter was only concluded on December 11, 1989, after a judicial finding of purposeful and inexcusable delay in the application process by West Windsor. Caton indicated that the CAP application on this property, which followed Maneely's, began in 1986 and continued for three-and-one-half years and more than fifty public hearings. On October 15, 1987, Judge Serpentelli ordered the West Windsor Planning Board to hold two full meet-

ings per month on the CAP application after finding that the Board's delays in processing that application were "unjustified," "purposeful or unexcusable."

Such delays, over a protracted period of time, appear to have contributed to the failure of some inclusionary sites to develop during the first cycle. While public resistance and the pressure it brings to bear on public officials may provide some explanation for delay, such factors do not provide an excuse for a municipality's non-compliance with the constitutional mandate articulated in the *Mount Laurel* cases.

4) *Zoning.* Lastly, plaintiff asserts that defendant's zoning ordinances contain a number of restrictive zoning standards that impact on the development of the inclusionary sites and have affected the township's ability to produce low and moderate income units during the first cycle. Among the restrictive ordinance provisions affecting inclusionary development still in place at the commencement of these proceedings, plaintiff cites the following:

a) The requirement in a number of defendant's inclusionary zones that a mix of high density units, such as townhouses, condominiums and zero lot-line singles or patio homes, be developed as the sole type of permitted market unit, while precluding the development of conventional single-family units on small lots that are in particular market demand;

b) The PRN–1 ordinance which required, until it was amended during trial, that 175 senior citizen low and moderate income units be built on Site 6 without regard to the number of market units built;

c) Ordinances requiring an unreasonable amount of common open and recreational space. Caton testified that in the PRN–1 zone, for instance, the ordinance required that as a minimum, the lesser of twenty-five percent of the development area or twenty percent of the gross development area must be devoted to common area open space and that wetlands were precluded from inclusion in that open space calculation. Defendant failed to

recognize in that requirement that detached single-family units provide their own open space, thereby reducing the need for open space in certain development scenarios. Meanwhile, the added cost of the open space requirements may limit development of the site;

d) Ordinance placing a maximum net density limit on particular dwelling types but containing definitions excluding certain areas from net density calculations. The ordinance is asserted to arbitrarily cap densities at the inclusionary site;

e) Ordinance 22–8.15, purporting to reduce gross densities permitted by as much as eighty-five percent in all districts based on the percent of sites ruled as environmentally constrained. Until amended during trial, this ordinance affected all but three of defendant's inclusionary sites. Based on estimates that approximately fifty percent of the inclusionary sites are environmentally constrained due to wetlands and floodplains alone, the ordinance purported to reduce the densities on all such sites by between forty percent and sixty percent. No attempt to comply with this ordinance was made by defendant's planning expert Madden in preparing his illustrative site yield plans, nor did those plans reflect the recreational space requirements of defendant's ordinance.

In sum, plaintiff asks this court to look beyond the face of defendant's assertedly inclusionary zoning. It asks for consideration of numerous factors—environment, infrastructure, market demand, municipal policy and other zoning-related factors—for a finding that defendant is deficient in its affirmative duty under the *Mount Laurel* cases. It asks for a builder's remedy to permit development of its property in a more cost-effective, market-responsive manner than defendant's current zoning allows.

### III.

#### A.

In *Mount Laurel I*, the Court found that a zoning ordinance that contravened the general welfare was unconstitutional and

that such a violation of the constitution occurred when a developing municipality excluded lower income families by excluding housing for lower income households through its zoning power. The doctrine was reaffirmed in *Mount Laurel II.*

Municipal land use regulations must affirmatively afford a realistic opportunity for the construction of the municipality's fair share of the region's present and prospective need for low and moderate income housing. *Mount Laurel I, supra,* 67 *N.J.* at 174, 336 *A.*2d 713; *Mount Laurel II, supra,* 92 *N.J.* at 205, 456 *A.*2d 390. A "realistic" opportunity means that "there is in fact a likelihood—to the extent economic conditions allow—that the lower income housing will actually be constructed." *Mt. Laurel II, supra,* 92 *N.J.* at 221–22, 456 *A.*2d 390.

The Supreme Court had already noted as early as in *Oakwood at Madison, Inc. v. Madison Tp.,* 72 *N.J.* 481, 541–42, 371 *A.*2d 1192 (1977), and quoted again in *Mount Laurel II, supra,* 92 *N.J.* at 303, 456 *A.*2d 390; "that the number and variety of considerations which have been deemed relevant in the formulation of fair share plans is such as to underscore our earlier observation that the entire problem involved is essentially and functionally a legislative and administrative, not a judicial one".

This court, in addressing the issues presented in the matter now at bar, must harmonize its finding of fact and law with COAH's regulations at *N.J.A.C.* 5:93–1.1 *et seq.* As the Supreme Court noted, "[w]e do not believe the Legislature wanted lower income housing to develop in two different directions at the same time, contrary to sound comprehensive planning." *Hills Dev. Co. v. Bernards Tp., supra,* 103 *N.J.* at 63, 510 *A.*2d 621.

In COAH, the Legislature has created a review process as an alternative to litigation of exclusionary zoning disputes. *See N.J.S.A.* 52:27D–303. A municipality may avail itself of this alternative by its voluntarily submission to COAH's jurisdiction: it must submit a resolution of participation, a housing element, and a proposed fair share housing ordinance implementing the housing

element. *N.J.S.A.* 57:27D–309. The municipality may then pursue substantive certification by COAH. *N.J.S.A.* 52:27D–313–314. If certification is granted, the municipality's affordable housing plan and implementing ordinances enjoy a presumption of validity that may only be overcome in subsequent litigation by clear and convincing evidence. *N.J.S.A.* 52:27D–317a.

Defendant in this case has not submitted its housing plan to COAH for certification. Defendant, having chosen not to act, not only loses the protection of any prior approval of its plan, but also loses any special presumption of validity.

For purposes of review, certification, and assessing fair share, COAH has specified six-year periods or "cycles." *N.J.A.C.* 5:93–2.1 through 2.20. The present cycle addresses housing needs and municipal obligations for the period 1993 to 1999. The prior cycle ran from 1987 to 1993.

Another means of meeting the fair share obligation is inclusionary zoning. An inclusionary zoning site is "a residential housing development in which a substantial percentage of the housing units are provided for a reasonable income range of low and moderate income households." *N.J.S.A.* 52:27D–304. The housing may encompass new construction, rehabilitated housing, or conversion of nonresidential structures. *N.J.A.C.* 5:93–1.3. The "substantial percentage" of affordable homes has been termed the "setaside." *N.J.A.C.* 5:93–1.3. The remainder of units in an inclusionary site, units not restricted to low or moderate income households, has been termed "market" units. *Ibid.*

COAH provides a "reduction" of the municipal housing obligation for any "realistic opportunity" created through the municipality's zoning powers for the prior cycle. *N.J.A.C.* 5:93–3.1(b). However, those inclusionary sites must be reviewed by COAH to affirm their continued viability as inclusionary sites. *N.J.A.C.* 5:93–3.5.

In the present action, COAH has ascertained that defendant's fair share of regional low and moderate housing need is 929 units

for the present cycle, 1993–1999 (of those, thirty units represent the need of the indigenous poor living in West Windsor). Plaintiff in this case asserts that defendant's zoning does not provide a realistic opportunity for the construction of low and moderate income housing, thus violating the *Mount Laurel* constitutional mandate. To determine whether defendant was in compliance with *Mount Laurel* at the time this law suit was filed in 1993, this court must look at a variety of factors.

▉ Case law provides that municipal compliance with this fair share housing obligation is to be measured by the actual success of a municipality in providing affordable housing opportunities. Mere good intentions or the adoption of plans that fail in fact to create a realistic likelihood of production of affordable housing do not satisfy a municipality's constitutional obligation:

> Therefore, proof of a municipality's bona fide attempt to provide a realistic opportunity to construct its fair share of lower income housing shall no longer suffice. Satisfaction of the *Mount Laurel* obligation shall be determined solely on an objective basis: if the municipality has *in fact* provided a realistic opportunity for the construction of its fair share of low and moderate income housing, it has met the *Mount Laurel* obligation to satisfy the constitutional requirement; if it has not, then it has failed to satisfy it.
>
> [*Mount Laurel II, supra,* 92 *N.J.* at 220–21, 456 *A.*2d 390 (footnote omitted, emphasis in original).]

Some of the considerations inherent in such a determination are reflected in *Mount Laurel II*'s discussion of Mount Laurel Township's asserted effort at inclusionary zoning:

> Mount Laurel's notion of providing a realistic opportunity to build lower income housing has led to the rezoning of less than one-fourth of one percent of its land (about 20 out of 14,700 acres). The municipality must satisfy its entire housing obligation; satisfaction of only some portion of that obligation does not suffice: "The municipal obligation to provide a realistic opportunity for low and moderate income housing is not satisfied by a good faith attempt. The housing opportunity provided must, in fact, be the substantial equivalent of the fair share."
>
> [*Id.* at 216, 456 *A.*2d 390.]

The question of what constitutes a "realistic" opportunity has been explained in some detail. Whether the opportunity provided by a municipality is "realistic" is measured by whether the municipality has made it likely that the low and moderate income

housing will actually be built, economic conditions allowing. *Id.* at 222, 456 *A.*2d 390. The affirmative duty was explained by Chief Justice Wilentz:

"Affirmative," in the *Mount Laurel* rule, suggests that the municipality is going to do something, and "realistic opportunity" suggests that what it is going to do will make it *realistically* possible for lower income housing to be built. Satisfaction of the *Mount Laurel* doctrine cannot depend on the inclination of developers to help the poor. It has to depend on affirmative inducements to make the opportunity real.

[*Id.* at 260–61, 456 *A.*2d 390.]

This discussion reflects a host of considerations that would affect a builder's motivation to build low and moderate income housing. It reflects a need to consider the nature of the parcel, as well as details of the zoning that have an impact on the cost of development and the profitable marketing of units constructed. Factors include environmental concerns, drainage, accessibility of sewer and water, surrounding uses, the status of proposed or approved development projects that might affect the likelihood of development, and any other factor that would affect the cost of bringing the affordable housing into being.

Above all, a developer's ability profitably to market a development will be crucial. As the New Jersey Supreme Court recognized, a builder is interested in "the benefits available to him when he builds . . . ." *Id.* at 299, 456 *A.*2d 390.

Case law has developed reflecting the Supreme Court's concerns and the relevant factors to be considered in assessing whether a realistic affordable housing opportunity has been created. At the very least, municipalities must remove all municipally created barriers to affordable development, such as zoning and subdivision restrictions and exactions. *Id.* at 258–60, 456 *A.*2d 390. Thus, the terms of all ordinances that affect a site must be considered to determine their impact on the likelihood of development. Unnecessary costs should be avoided not only so affordable units can be built, but so that market units within a development containing affordable units can be profitably marketed. *See, e.g.,*

*Urban League of Essex Cty. v. Mahwah Tp.*, 207 *N.J.Super.* 169, 211–12, 504 *A.*2d 66 (Law Div.1984).

██ Where a municipality cannot otherwise meet its fair share obligation, it must employ a mandatory setaside as an inclusionary device, requiring developers to reserve a minimum amount of lower income housing in new developments. *Mount Laurel II, supra*, 92 *N.J.* at 267–68, 456 *A.*2d 390. A realistic opportunity to provide a municipality's fair share may also require overzoning for affordable housing in recognition of the fact that it is usually unlikely that all of the property made available for such housing will actually be developed. *Oakwood at Madison, Inc. v. Madison Tp., supra*, 72 *N.J.* at 519, 371 *A.*2d 1192.

With those broader considerations in mind, the court must consider:

██ 1) Site development standards, e.g., standards concerning the size or appearance of the housing—which are unrelated to health or safety, but which increase the cost of constructing the housing. *Home Builders League v. Berlin Tp.*, 81 *N.J.* 127, 405 *A.*2d 381 (1979); *AMG Realty Co. v. Warren Tp.*, 207 *N.J.Super.* 388, 445–46, 504 *A.*2d 692 (Law Div.1984); *Urban League of Essex Cty. v. Mahwah Tp., supra*, 207 *N.J.Super.* at 208–37, 504 *A.*2d 66. This includes site development standards that might be permissible in other contexts. *Urban League of Essex Cty. v. Mahwah Tp., supra*, 207 *N.J.Super.* at 208–37, 504 *A.*2d 66.

██ 2) Restrictive requirements concerning the type or mix of housing that may be constructed. These may impose barriers or burdens if they increase the cost of development. *See Mount Laurel II, supra*, 92 *N.J.* at 296, 456 *A.*2d 390; *Oakwood at Madison, Inc. v. Madison Tp., supra*, 72 *N.J.* at 507–08, 371 *A.*2d 1192.

██ 3) Infrastructure requirements concerning the provision of public water, sanitary sewers, storm sewers, or roads, which may unnecessarily increase costs of development. *Mount Laurel*

*II, supra,* 92 *N.J.* at 297–99, 456 *A.*2d 390; *Urban League of Essex Cty. v. Mahwah Tp., supra,* 207 *N.J.Super.* at 227, 504 *A.*2d 66 (excessively expensive sewer design requirements), 231–32 (excessive hookup fees).

4) Environmental constraints on development. Sites that have wetlands, wetland transitional areas, flood hazard areas or steep slopes, or that require extensive cleanup to eliminate environmental hazards created by past uses, are to that extent not available for development and do not create realistic housing opportunities. *Mount Laurel II, supra,* 92 *N.J.* at 297–99, 456 *A.*2d 390.

5) Availability of infrastructure. Sites only create realistic housing opportunities where water and sewer service can be brought to the site at a reasonable cost that does not unduly increase the cost of the development. Municipalities have an affirmative obligation to facilitate provision of the infrastructure necessary to make development realistically likely. *Mount Laurel II, supra,* 92 *N.J.* at 297–99, 456 *A.*2d 390; *Dynasty Bldg. Corp. v. Borough of Upper Saddle River,* 267 *N.J.Super.* 611, 616, 632 *A.*2d 544 (App.Div.1993), *certif. denied,* 135 *N.J.* 467, 640 *A.*2d 849, *appeal dismissed,* 135 *N.J.* 468, 640 *A.*2d 849 (1994).

6) The expressed willingness of a property owner to develop inclusionary housing, or to sell the property to a developer who will do so. *Mount Laurel II, supra,* 92 *N.J.* at 297–99, 456 *A.*2d 390. A property owner's credibly expressed unwillingness to develop a property due to a belief that it will not be profitable to do so, can be evidence that the zoning is not realistically likely to result in the creation of affordable housing. *See Urban League of Essex Cty., supra,* 207 *N.J.Super.* at 194–95, 504 *A.*2d 66. The probative value of evidence regarding an owner's disposition with regard to development will depend in part upon the circumstances. *See Van Dalen v. Washington Tp., supra,* 205 *N.J.Super.* at 338, 500 *A.*2d 776. Where the property is in multiple ownership, the likelihood and costs of assembling ownership must be considered,

as well as the effects upon the likelihood of development of failure to assemble. *Urban League of Essex Cty., supra,* 207 *N.J.Super.* at 195, 504 *A.*2d 66.

This definition of "realistic opportunity" is consistent with COAH's definition. When reviewing assertedly inclusionary zoning, COAH "[s]hall include but not be limited to a consideration of environmental factors, the location of existing infrastructure and the likelihood of the current zoning to result in the creation of low and moderate income housing during the period of substantial certification." *N.J.A.C.* 5:93–3.5.

COAH requires a municipality to present a variety of evidence. For example, housing elements submitted to COAH must include a detailed inventory and projection for the municipality's housing stock, an analysis of the municipality's demographics, a map of all proposed inclusionary sites, information pertaining to location and capacity of water and sewer lines, New Jersey Freshwater Wetlands Maps (where available) and United States topographical maps. *N.J.S.A.* 52:27D–310; *N.J.A.C.* 5:93–5.1(b)1 through 14. Municipalities must also present extensive detailed evidence as to each assertedly inclusionary site. This evidence is to include acreage, surrounding uses, street access, environmental constraints, and infrastructure access, as well as proposed densities and yields. *N.J.A.C.* 5:93–5.3.

COAH's mission as it pertains to inclusionary zoning is broadly stated at *N.J.A.C.* 5:93–3.5:

> Where land has been zoned for low and moderate income housing, the Council shall review sites for suitability and determine if the previously zoned sites present a realistic opportunity for low and moderate income housing before granting a reduction. In its review, the Council shall include but not be limited to a consideration of environmental factors, the location of existing infrastructure and the likelihood of the current zoning to result in the creation of low and moderate income housing during the period of substantive certification. Such a review shall result in a determination of the appropriate reduction and may result in requirements for zoning amendments.

COAH thus conducts a fact-finding mission, reviewing the sites and considering a wide variety of factors to determine whether a realistic opportunity for inclusionary development exists. It re-

quires municipalities to present considerable evidence for its review.

Notably, one of the cost-generating factors COAH "shall give special attention to" is any requirement "to provide oversize water and sewer mains to accommodate future development without a reasonable prospect for reimbursement." *N.J.A.C.* 5:93–10.2(a)2.

Read together, COAH's requirements and review mirror the New Jersey Supreme Court's requirement that the opportunity be "realistic," not merely a "phantom".

██ Critical to plaintiff's concern is whether "market" factors should be considered. Defendant freely acknowledges that necessary costs of development that would result in unmarketable, expensive units must be considered. However, it asks this court not to consider market demand, or lack thereof, for any one type of housing. Specifically, defendant's *Mount Laurel* plan relies very heavily on zoning for multi-family and novel housing types, to the virtual exclusion of conventional single-family homes. Plaintiff asserts that the market for the housing types currently permissible in defendant's inclusionary sites is minimal and cannot be relied upon to create any realistic opportunity for inclusionary development.

This court cannot conclude that the inclusion of sites zoned for a type of housing for which there is little market demand inherently excludes those sites from being considered inclusionary. However, this court will examine defendant's inclusionary zoning scheme as a whole to determine whether anticipated inclusionary development is grounded in reality, or whether it is indeed a "phantom."

Where a particular type of housing, as a matter of fact, controls only a minute fraction of the market, but a municipality has zoned a major portion of its inclusionary sites for such housing, there can be little doubt the opportunity to construct affordable housing is more illusory than real. Although a single developer may develop one site with a housing type of lesser demand, it is wholly unrealistic for a municipality to imagine that a majority of numer-

ous sites will so develop. A builder would derive little benefit from building a housing type for which supply is already in excess of demand.

In essence, for inclusionary development to be likely, the developer's cost/benefit analysis must be favorable to development. Although the costs of building have been factored in explicitly, the question of marketability after costs, and thus market demand, has always been a consideration, implicitly if not explicitly. If this were not the case, municipalities could engage in exclusionary zoning by simply zoning extensively for "inclusionary" development of a housing type for which there is little or no demand. Neither the Supreme Court nor COAH contemplated or would tolerate such a result. Market demand will be considered as a factor in assessing whether defendant is in compliance with *Mount Laurel.*

The Legislature specifically instructed:

In preparing the housing element, the municipality *shall consider* the following techniques for providing low and moderate income housing within the municipality, as well as such other techniques as may be published by the council or proposed by the municipality:

(1) *Rezoning for densities necessary to assure the economic viability of any inclusionary developments,* either through mandatory setasides or density bonuses, as may be necessary to meet all or part of the municipality's fair share....

[*N.J.S.A.* 52:27D–311a (emphasis added).]

This is consistent with COAH's current policy as well. In COAH's regulation for the present and prospective six-year cycles, new consideration has been given to the issue of housing density. Specifically, *N.J.A.C.* 5:93–5.6 provides in part:

(a) Municipalities that choose to provide zoning for inclusionary development shall select sites that conform to the criteria in N.J.A.C. 5:93–5.3 and shall submit the information required in N.J.A.C. 5:93–5.3.

(b) *The Council's review* of municipal plans to zone for inclusionary development shall include, but not necessarily be limited to: the existing densities surrounding the proposed inclusionary site; the need for a density bonus in order to produce low and moderate income housing; whether the site is approvable, available, developable and suitable pursuant to N.J.A.C. 5:93–1.3; the site's conformance with the State Development and Redevelopment Plan pursuant to N.J.A.C. 5:93–5.4; the existence of steep slopes, wetlands and floodplain areas on the site; the present

ability of a developer to construct low and moderate income housing at a specific density; the length of time an inclusionary site has been zoned at a specific density and setaside without being developed; and the number of inclusionary sites that have developed within the municipality at specific densities and setasides.

1. When a municipality is receiving an adjustment pursuant to N.J.A.C. 5:93–4.2, the municipality shall be required to zone inclusionary sites at a minimum gross density of six (6) units per acre with a 20 percent setaside.

2. In all other municipalities, *when the review described in (b) indicates that such densities are appropriate, the Council shall require that a substantial percentage of inclusionary sites be zoned to allow market units within an inclusionary development to be constructed as single-family detached units.* For these sites, the Council shall generally favor a gross density of four units per acre with a 15 percent setaside. Municipalities may also seek to zone sites for a gross density of five (5) units per acre with a 17.5 percent setaside and six (6) units per acre or more with a 20 percent setaside. The Council shall determine setasides for densities between four (4) and five (5) and between five (5) and six (6) through a process of interpolation.

(c) *The Council may require higher densities* in circumstances including, but not limited to:

1. Where the existing zoning exceed the density proposed by the municipality; or

2. *When the Council determined that higher densities are required to provide an opportunity for inclusionary development in a specific municipality; based on the particular circumstances of that municipality.*

[Emphasis added.]

## COAH subsequently explained that language: ·

*N.J.A.C.* 5:93–5.6 has been revised to provide criteria for the review of zoning for inclusionary sites. The criteria balances planning considerations with [COAH's] belief that the ultimate construction of low and moderate income housing will be facilitated by encouraging developments that allow market units to be constructed as single-family detached housing. The rule permits some flexibility to zone some land for higher densities because planning considerations may dictate higher densities. In addition, *[COAH] recognizes that housing markets change* and by permitting some zoning at higher densities *land will be available to accommodate the changes in housing demand.*

[25 *N.J.R.* 5787 (Dec. 20, 1993) (emphasis added).]

## COAH has further commented:

*N.J.A.C.* 5:93–5.6(b) does not establish an inflexible standard that requires all sites to be zoned for a single-family inclusionary product. The rule establishes criteria that should be considered by the municipality and will be considered by [COAH] in determining the appropriate zoning for a specific site. *The factors to be considered include land use planning considerations and a consideration of the current market.* After consideration of these factors, [COAH] may require that a substantial percentage of inclusionary sites be zoned to allow market units within an inclusionary development to be constructed as single-family detached units.

[26 *N.J.R.* 2304 (June 6, 1994) (emphasis added).]

COAH has definitively indicated that market demand is an appropriate factor to consider when addressing *Mount Laurel* compliance issues. If defendant has over-zoned for densities and types of housing for which there is little or no market, it cannot realistically expect development to occur.

Defendant challenged the provisions of *N.J.A.C.* 5:93–5.6 in the Superior Court, Appellate Division while the present matter was pending. The Appellate Division, noting defendant's obvious concern that the COAH regulation might influence the decision in a pending *Mount Laurel* case, upheld the code provision. *In re Adoption of N.J.A.C. 5:93–1 to –13.4*, No. A–6149–93T (App.Div. June 10, 1996). The court described the regulation as one appropriate measure "to assure the economic viability of an inclusionary development." *Id.*, slip op. at 14.

In addressing how many units of affordable housing an inclusionary site is realistically likely to yield, market demand factors will have a significant impact. Where a municipality has zones to permit a variety of housing types, it is unrealistic to expect extensive development of one of those types if there is little or no real market for it. Although market demand will not govern as a rule, it is a factor that must be considered by this court, and by municipalities in developing their compliance plans.

## B.

A significant issue presented in this case pertains to the burden of persuasion in a "second-round" case as to the continued viability of first-cycle inclusionary sites that have failed to develop. Defendant asserts the burden rests with plaintiff, citing the presumption of validity its ordinances generally enjoy. *See, e.g., Zilinsky v. Zoning Bd. of Adjust.*, 105 *N.J.* 363, 368, 521 A.2d 841 (1987). Plaintiff asserts that in a "second round" case, a substantial burden rests with defendant, who must explain the prior cycle sites' failure to develop. This court concludes that in a second-cycle case, where a defendant municipality has failed to produce

significant actual construction of affordable homes over the course of years despite a tremendous boom in its housing market, and where defendant has previously received credit for undeveloped sites in its inclusionary plan, the burden rests with defendant to explain to the satisfaction of the fact finder why the previously credited sites have not developed.

The failure of affordable housing development over almost ten years in the midst of a housing boom leads to a legitimate question as to the viability of defendant's compliance plan. The failure of defendant's affordable housing plan, which has remained largely intact since a prior judgment in 1985, leads to an inference that the plan does not, in fact, create a realistic opportunity for inclusionary development. In the factual context of a housing boom in West Windsor Township during this period, a fact finder can legitimately infer that if it did, more development would have taken place.

The initial scheme of burdens was laid out in *Mount Laurel II*. The Supreme Court stated:

> Plaintiff may continue to prove ... that the land use regulations fail to provide a realistic opportunity for low and moderate income housing or that they contain "expressly prescribed requirements or restrictions which preclude or substantially hinder it." *Mount Laurel I*, 67 N.J. at 180–81, 336 A.2d 713. As before, such a showing shall create a *prima facie* case of a failure to satisfy the *Mount Laurel* obligation. The municipality shall then have the heavy burden of demonstrating, by a preponderance of the evidence, its fair share and its satisfaction of that share or *any justification of its failure.*

[*Mount Laurel II, supra,* 92 N.J. at 222–23, 456 A.2d 390 (emphasis added).]

Thus, at least with regard to inclusionary sites that are new in this cycle, plaintiff bears the burden of presenting enough evidence to create a *prima facie* case as to a lack of realistic opportunity. However, the burden of persuasion is not always upon plaintiff. While the Court recognized the importance of the presumption of validity of governmental action, *id.* at 305–06, 456 A.2d 390, the presumption is not eternal in the context of *Mount Laurel* litigation:

Given the importance of the societal interest in the *Mount Laurel* obligation and the potential for inordinate delay in satisfying it, presumptive validity of an ordinance attaches but once in the face of a *Mount Laurel* challenge....

This ruling is similar to *Kruvant v. Mayor & Council Tp. of Cedar Grove*, 82 *N.J.* 435, 414 *A.2d* 9 (1980), where we announced a "time of decision" rule that precluded a municipality from blocking a particular use of land by continually adopting prohibitory ordinances, one just as invalid as the next. There was a time to stop, we said, and while it may have taken six ordinances in *Kruvant* before we called a halt to dilatory municipal action, the principle is the same: depending upon the circumstances, a time must come when the courts will cease to defer in the conventional manner to municipal action. In *Kruvant*, we refused to consider the most recently adopted municipal ordinance; here we refuse to accord presumptive validity to Mount Laurel's revised ordinance.

[*Id.* at 306, 456 *A.2d* 390.]

Although the affordable housing plan and inclusionary sites at issue here have not previously failed any test of compliance in court, they have now failed the test of time. Since the prior judgment of compliance was entered approximately one decade ago, most of defendant's inclusionary sites have failed to develop despite a housing boom. Defendant's affordable housing plan enjoyed a presumption of validity through the first cycle; defendant must now, in this second cycle, explain why the sites have failed to produce housing. Although plaintiff bears the burden of coming forward and presenting a *prima facie* case as to sites not previously credited, defendant bears the burden of explaining the failure to develop sites for which it received credit ten years ago.[5]

The shift of the burden to defendant with regard to sites that have failed to develop over ten years in the midst of a housing boom is consistent with COAH's rules. As noted previously, COAH already requires a municipality *ab initio* to present considerable information concerning its inclusionary sites. This includes

---

[5] This court concludes in this opinion that the burden of proof in this "second-round" case shifts to defendant to establish why previously credited sites have not developed. Notwithstanding this conclusion, plaintiff has developed sufficient facts to establish the reasons why defendant's inclusionary sites failed to develop and to demonstrate defendant's non-compliance with *Mount Laurel*. Even if the burden did not shift, plaintiff has successfully met the burden in its case.

site-by-site data relevant to the likelihood of development. *See* *N.J.A.C.* 5:93–5.6 and 5.3. With regard to sites from a previous cycle, COAH has stated that "[t]he reduction for low and moderate income units that have been zoned but have not been built should not be viewed as automatic. The Council will review these sites for suitability and determine why each site has not developed before granting a reduction." 25 *N.J.R.* 5769 (Dec. 20, 1993).

COAH makes a specific inquiry into the reasons for failure of the sites and requires the municipality to present the necessary evidence for review of this issue. A COAH release titled "Information Required for Previously Certified But Undeveloped Sites" and dated December 1994, announced the requirement of specific information for previously certified but undeveloped sites:

This information is required for sites previously certified by COAH as well as those sites that were part of a court settlement and now fall under COAH's jurisdiction if such sites are to be included in fair share plans that address the cumulative 12 year obligation. There is an underlying assumption that the municipality and the owner and/or option holder and/or developer of the site have had a dialogue regarding an undeveloped site:

Undeveloped Sites in Previously Certified Plans That Present Or Do Not Present a Realistic Opportunity

A certification from the municipality that the site:

a. is available, approvable, suitable and developable as per *N.J.A.C.* 5:93–1.3;

b. statement as to consistency or inconsistency with the State Development and Redevelopment Plan as per *N.J.A.C.* 5:93–5.4;

c. contains new or no new environmental constraints that would or would not preclude development;

d. *is zoned at a density that is reflective of market conditions;*

e. *has infrastructure available;*

f. has remained undeveloped for what period of time and *the reasons it has not been developed;*

g. can realistically be developed within the term of the new certification.

[Emphasis added.]

Based on the assumption that the municipality has communicated with the party controlling the site, the release also requires a certification from that party.

In a second cycle review of sites from the prior cycle, COAH thus demands that a municipality make affirmative statements

that the relevant density standard is responsive to market conditions and that infrastructure is available. More importantly, COAH demands that the municipality explain the sites' failure to develop in order to demonstrate their continuing viability as inclusionary sites. So shall this court.

Inclusionary zoning is particularly important in this case because defendant has elected to meet its fair share primarily through this method. Against this review of the law, this court must examine the relevant factors and suggested causes for defendant's lack of compliance.

## IV.

 Plaintiff's primary argument in this matter is that defendant's compliance plan fails to consider actual market demand for housing and thus fails to create a realistic opportunity for satisfaction of its affordable housing obligation. The dispute contrasts a compliance plan which relies heavily on multi-family housing against plaintiff's view that compliance should now be accomplished through an expanded use of conventional single-family detached housing. Plaintiff's argument is premised on the theory that there is a limited market for the former type of housing and an expanding market for the latter type. In sum, plaintiff argues that defendant's failure to devise a plan that utilizes housing types for which there is a substantial market demand, in the context of its plan's failure to generate compliance by some other means within the compliance period, violates *Mount Laurel* and the Act.

Since its inception, defendant's compliance program has been characterized by the reliance on inclusionary zones that in turn rely almost exclusively on multi-family housing or unconventional, zero lot-line single-family detached housing. History has demonstrated that, for the most part, development was not achieved in these zones. With the exception of two projects, Windsor Haven and Steward's Watch, no development has occurred in the original inclusionary zones since the plan's inception in 1985. Further, none of the units actually constructed, and few, if any, of those

that have ever been proposed, were unconventional zero lot-line units. In contrast, a massive amount of development of conventional single-family detached homes has occurred in non-inclusionary zones.

Given the advantage of "hindsight" that a "second-round" case provides, and given available market data, plaintiff asserts that defendant, having recycled the same sites and the same approach from the first cycle, has failed to capitalized on the strong conventional single-family housing market. Plaintiff argues that defendant should be required to allow inclusionary developers the flexibility to respond to that market.

After commencement of this litigation, and, essentially, after the commencement of the trial, defendant modified its zoning and policies to attempt compliance:

1) it provided guarantees to support a rehabilitation program;

2) it rezoned ROM–2 lands adjacent to Site 8 for inclusionary zoning to be included in Site 8;

3) it provided commitment and financial support for a non-profit, age-restricted development at the Exxon site;

4) it rezoned the LaPlaca site, and committed to the exclusion of its commercial component from its slow growth ordinance (despite its inclusion in the calculations of funds anticipated to be yielded from a development fee ordinance);

5) based on advice from its counsel, it informally exempted all *"Mount Laurel"* development from the density reduction ordinance (although the ordinance had not been repealed) and, later, formally amended the ordinance to exempt all inclusionary zones;

6) it rezoned lands for the PRRC and NJIT[6] inclusionary zones, *infra,* at 126 and 131, respectively; and

---

[6] For reasons unrelated to issues raised in this case, this court determined that the NJIT zone was invalid.

7) it provided for development fees to be committed to inclusionary development.

Of these new measures, only the NJIT and PRRC zoning provided inclusionary developers with the option of constructing conventional, single-family detached units. These are specialty zones, however, containing other constraints: the NJIT zone was designed for a specific government-sponsored project, and the PRRC zone is limited to a single site for age-restricted development.

With the exception of the NJIT and PRRC zones, the new construction component of defendant's compliance plan remains today as it was in 1985, relying almost exclusively on multi-family housing as the vehicle for development of inclusionary projects. Conventional single-family detached housing is generally not permitted in the inclusionary zones. The single-family detached housing that is permitted either must be located in a specialty zone, or it must be a novel product, e.g., zero lot-line homes. The zero lot-line house, where one side of the house is windowless and lies directly on a side lot-line, is a relatively untested product with, at best, a minimal market niche and speculative absorption capacity.

The proofs demonstrated that defendant has a strong market for the conventional, single-family detached product. This has been the dominant form of newly constructed housing in West Windsor and its primary market area as demonstrated by long term historical experience, recent development history and anticipated growth during this fair share cycle. Yet, as it has in the past, defendant essentially eschews reliance on this product type in its affordable housing plan.

The proofs demonstrated that reliance on the multi-family product failed to achieve construction of affordable housing in the last fair share period despite a boom in housing generally and the rapid construction of conventional single-family detached homes.

Plaintiff's experts, Caton and Richard D. Reading, and defendant's expert, William E. Becker, provided testimony and data indicating clearly that reliance on the multi-family product in the next compliance period would not achieve construction of West Windsor's fair share within the compliance period. Even the most optimistic view of the demand for multi-family housing indicates a substantial short-fall in the production of affordable housing. Although he hedged, citing his 'sense' of developer interest, defendant's planning expert, Madden, essentially concurred in this view. In sum, the actual and projected demand for multi-family units is far less than the amount for which defendant has zoned. Even the flawed, highest projection of multi-family demand proffered by one of the experts would not yield sufficient production to satisfy defendant's fair share. Plaintiff plausibly suggests that defendant's refusal to permit inclusionary developers to utilize the conventional single-family detached product minimizes the likely number of units that will be achieved and unnecessarily constrains its ability to meet its fair share within the compliance period.

Plaintiff argues that even if there were no scenario under which the full fair share could be realized during the compliance period, it is clear, from a planning and market demand perspective, that there would be greater achievement toward that end if some reliance were placed on conventional single-family detached housing; that is, if developers were permitted to utilize this product in inclusionary zones.

All of the experts have agreed that the impact of market forces is one of the factors which must be considered in determining whether the housing opportunity apparently created by a zoning ordinance is realistic, and which type of housing, among those permitted in a given zone, developers are reasonably likely to develop.

There are two ways in which market forces may impact on the realization of the fair share. First, the zoning may be such that the actual construction of housing is either unnecessarily constrained, highly unlikely or precluded by market conditions. Sec-

ond, the zoning may be such that, taken as a whole, and considering market conditions as merely one factor, the satisfaction of the fair share within the designated fair share period is either unnecessarily constrained, highly unlikely or precluded.

Examples of market factors coupled with inconsistent zoning provisions which may have such an impact are:

a) ordinances which rely almost exclusively on one product type, such as multi-family housing, which has limited market appeal, to the exclusion of product types, such as single-family detached housing, which have broad appeal or, at least, have appeal to a broad class of consumers not covered by the multi-family product;

b) zoning for high-rise construction in areas where there is no market for that product;

c) zoning for novel housing product types, such as zero lot-line units, to the exclusion of conventional product types, such as traditional single-family detached units; or

d) ordinances that require excessive affordable housing setasides for inclusionary developments that cannot be financially achieved given the current market.

The following "market force" concerns have been raised in this matter:

1) Defendant's inclusionary zoning plan relies excessively on the production of multi-family housing in that the degree of its reliance is inconsistent with anticipated demand for that product within the compliance period;

2) Defendant's plan also relies inappropriately on a particular *unconventional* single-family housing type—zero lot-line units—that have an unproven market niche and no reliable track record to assure that necessary development and absorption rates will occur within the fair share period;

3) Except as to the new NJIT and PRRC zones, defendant's zoning plan does not have conventional single-family detached

housing as permitted uses within inclusionary developments. It thus forsakes a housing type that has the most established market niche and a history of relatively reliable absorption rates;

4) Defendant's zoning plan relies inappropriately on public assistance for development of certain inclusionary zones, such as tax credits and funding from the New Jersey Department of Community Affairs, the New Jersey Housing Mortgage Finance Agency, or the United States Department of Housing and Urban Development. Such assistance has not been committed to date and there is no guarantee it would be available within the compliance period. There would be no market for these developments absent such funding; and

5) Defendant's plan, as reflected in the proposed yields prepared by defense witness Madden, envisions that 3,810 units will be constructed on 4217.5 developable acres on sites 1, 2, 6, 5, 5A, 7, 8, B, and R–3A. The densities, measured in terms of units per developable acre, on these sites range from 6.36 to 20, with an average density of 8.91. These densities necessarily entail the construction of multi-family housing, a product type for which there is little actual or projected demand.

## A.

Plaintiff's expert, Reading, testified at length about the nature of the multi-family market in general and in West Windsor Township specifically. This court will summarize his testimony.

Reading noted that a site zoned for inclusionary development creates a realistic opportunity for the creation of low and moderate income housing only to the extent that the developer can profitably market the number and type of market-priced units permitted by the zoning. The ability of a developer to profitably sell market-priced units depends on supply and demand factors in the relevant market as well as the costs associated with building. For plaintiff's Site 6, as well as the other inclusionary sites for which defendant seeks credit, it is useful to consider both the

Mercer–Middlesex housing market and suburban Mercer and Route 1 Corridor submarkets.

Demand for new housing is the result of households drawn into the area by employment growth and households entering or moving up in the housing market as a result of demographic progression of the existing population. Because the economy in this region has suffered a significant decline and has not yet regained the jobs lost in the late 1980s, employment accounts for little of the demand.

Demographic progression of the existing population is dominated by the baby boom phenomenon. When the baby boom generation was entering the housing market, there was strong demand for entry-level housing. The peak of the baby boom generation entering the housing market has now passed. Currently, the bulk of the demand is generated by baby boom generation households seeking to move up in the market.

These demand factors affect both the amount and the type of housing that can profitably be marketed in this housing market:

1) Fewer housing units can be profitably marketed. This is in fact reflected in a drop in housing production.

2) The demand is not for entry-level housing, such as townhouses and garden apartments, but for larger houses suitable for raising families demanded by households that are moving up in the market.

The ability of a developer to profitably market units is also affected by the supply of similar units already available in the market. The extent of the supply can be assessed by evaluating vacancy rates, the amount of similar housing already on the market and "in the pipeline," the extent to which other projects containing similar housing are being successfully marketed, and the amount and variety of other types of housing currently being built and sold.

Plaintiff's expert offered statistical information that is helpful in assessing market demand. First, the oversupply of the type of

entry-level housing built in the 1980s has led to a dramatic increase in vacancy rates. Statewide, the 1990 vacancy rate was 7.1 times that for 1980. In West Windsor, the number of new units grew by 112.4% during the 1980s, while the number of vacant units grew by 851.0%. Vacancies are concentrated in new, small attached units. Twenty-six percent of all condominium units in West Windsor are vacant, compared with five percent of non-condominium units. Sixteen percent of all attached units are vacant, while only four percent of all non-attached units are. Twelve percent of all units constructed between 1985 and 1990 are vacant, compared with 3.1% of all older units. The highest vacancy rates are concentrated in the newest units: 29.1% of all units constructed in 1989 and 1990 are vacant. 18.1% of all two-bedroom units are vacant, compared with 4.6% of all four-bedroom and 1.5% of all five-bedroom units.

Second, there is a large supply of attached housing units available in the resale market. Currently, about twenty percent of the units on the market in West Windsor are attached units. Almost two-thirds of the units on the market in Plainsboro (which shares the same school system) are attached units.

Developers have had difficulty selling the units in the most recently constructed attached housing developments. This is confirmed by the fact, reported by defendant's marketing consultant Becker, that many of the units in the 621–unit Canal Pointe attached housing development were purchased by investors, not by owner occupants. Similarly, at Collonade Point, a 252–unit development, eighty-six unsold units were sold at auction in 1990 at prices substantially below the developer's previous asking price.

Although defendant experienced enormous housing growth in the 1980s, virtually none of this growth took place at the inclusionary sites. As a result, numerous inclusionary developments consisting of townhouses and garden apartments are still in the planning stages at the densities and acreages set forth in Madden's yield projection. There are 3,810 townhouse and garden apartment units planned for these sites.

During the 1980s, attached housing made up about one-third of the housing constructed in West Windsor. Since 1990, attached housing has made up only 4.9% of the housing constructed in West Windsor. This same pattern is evident in the Middlesex–Mercer housing region.

Earlier data suggested that at least two-thirds of the market demand should be for single-family detached houses and no more than one-third should be for attached housing. Based upon the most recent data, the attached housing makes up an even lower share of the demand—no more than ten percent.

According to Reading, defendant's compliance plan, as reflected in the various reports submitted by municipal planner Madden, is based upon inclusionary zoning of ten sites at densities ranging from 6.36 to 20 dwelling units per acre. Construction at such densities necessarily relies upon attached housing, especially three-story garden apartment "stacked flats." This zoning has resulted in virtually no inclusionary development in West Windsor during the past ten years, despite West Windsor's having experienced a remarkable housing boom during that period. In the present market, high density attached units is the type of housing that developers are least likely to be able to market profitably. Reading concluded that defendant's plan does not create realistic opportunities for the creation of affordable housing.

He noted that to create a realistic opportunity for development of low and moderate income housing, inclusionary zoning must give the developer the maximum flexibility to design and sell market-priced housing products that respond to actual housing demand.

Plaintiff's expert asserts that in the current West Windsor market, conventional single-family houses on relatively small lots is the housing type that will be profitably marketed. This type of housing product is not currently authorized by defendant's zoning. It is, however, being successfully marketed in other similar communities, and may appeal to the households that are currently seeking single-family detached housing in West Windsor. Cer-

tainly, this product has the potential to appeal to some households who are currently buying townhouses, many of whom would prefer single-family houses on small lots if such a product were available in West Windsor. Meanwhile, the unusual zero lot-line house is perceived by buyers to be an unattractive housing product.

## B.

Defendant responded to plaintiff's assertions through the testimony of its own experts—Becker and Madden. Defendant asserts that two thirds of the inclusionary demand in the area is for multi-family units. Becker's thesis, contrary to Reading's, is that there is now and will be an active multi-family market through this fair share cycle.

Defendant relies on the following facts to support this conclusion.

1) Property owners and developers are interested in developing multi-family housing on parcels in West Windsor. The contract purchasers of both the Copperfield and LaPlaca tracts are proceeding with development plans for 678 multi-family market units, 568 rental garden apartments and 110 townhouses, and the owner of Site 1 and an owner of Site 8 have indicated that they intend to proceed with multi-family development on their properties.

2) Forty-two percent of the total demand in the for-sale market for the remainder of the fair share cycle in the area is for multi-family units and fifty-eight percent is for single-family units. More importantly, when housing products not normally marketed in inclusionary developments, namely, large-lot, single-family homes and products for families with a household income of $100,000 or more, are excluded from the demand calculations, the percentage of single-family demand drops to 32.5%, and the percentage of multi-family increases to 67.5%. Defendant asserts these higher-end products should be excluded from the inclusionary demand calculations because more affluent households usually would not opt to buy in an inclusionary development, and because large-lot, single-family houses and products marketed to house-

holds earning $100,000 or more are generally not found in such developments. Even if one were to include demand by households with annual incomes of $100,000 or more, the demand for single-family product would increase only to 34.2%. Additionally, Becker's figures do not include rental housing, which is virtually always multi-family, and inclusion of the rental housing demand would further increase the multi-family share.

Defendant argues that Becker's exclusion of the demand for large-lot singles in calculating inclusionary demand was appropriate. Becker and Madden testified that this was appropriate because, except in unusual cases, large-lot singles have not and will not be marketed in inclusionary developments. Moreover, Caton conceded on cross-examination that large-lot singles are typically not found in inclusionary developments and should not be included when calculating inclusionary demand.

Defendant notes that if large-lot singles were to be included, a competitive analysis would have to be done because there is and will be so much large-lot product in non-inclusionary developments competing with builders trying to market the same product in *Mount Laurel* developments. As Madden testified, there are 633 approved and unbuilt large-lot singles in West Windsor alone. Defendant adds that large-lot singles should not be included in inclusionary developments, and the demand for these units should not be incorporated into any analyses of the inclusionary market, since single-family dwellings use up a tremendous amount of land while producing little affordable housing. This court notes that large-lot, single-family zoning still is what it has historically been—an exclusionary device.

Becker's analysis was limited to the for-sale market. As plaintiff has noted, Becker dropped the under $50,000 income cohort from his analysis when he segmented demand by income cohort and product type. Becker excluded it because his market analysis did not include rental, and, he asserted, the under $50,000 cohort is rental-oriented.

Notably, defendant's demand analysis does not address a signifi-
cant factor—it does not analyze the extent to which demand for
various product types is reduced by the availability of competing
product on the market. Little quantification was offered by any
party as to what ultimate impact this factor would have on the
relative shares of the inclusionary market demand of multi-family
and single-family product.

Defendant asserts that there appears to be a strong market for
rental housing, which is invariably multi-family. The market
assessments by the Copperfield and LaPlaca developers are
strong indications of this. In addition, the Trammel Crow rental
development in Lawrence Township along the West Windsor
border has had a strong market response, and the vacancy rate at
Steward's Watch, the large inclusionary rental development in
West Windsor, is extremely low.

Defendant claims that other evidence also indicates that there is
an active multi-family market in the immediate area. There are a
number of multi-family developments now under construction in
Plainsboro, Princeton Township, Cranbury, and South Brunswick.

Also, defendant suggests that while plaintiff submitted an eco-
nomic analysis reviewing past housing trends and concluding that
there would be a market in the future for small-lot, single-family
development, that analysis is fundamentally flawed. It is not a
market analysis and fails to quantify or segment the market
components, or to qualify demand through use of a competitive
analysis. More importantly, it does not predict future trends or
contain any quantification as to future demand either overall or by
product type.

Defendant disagrees with the statements of Arthur Bernard,
former Executive Director of COAH and now plaintiff's expert,
regarding multi-family demand. Bernard claimed that the fact
that a number of the West Windsor affordable housing sites were
not developed during the first fair share period is indicative of a
weak multi-family market in the future. First, the fact that
certain sites were not developed in the past—in West Windsor, as

elsewhere, this includes single-family as well as multi-family sites—is of dubious value in predicting the future housing market. Indeed, defendant notes that no one other than Bernard, not even Reading, suggested that this fact had any predictive value. Defendant asserts that the past history of the sites indicates that there was an active multi-family market during the first fair share cycle, since the two largest sites, Countryside (now Toll) and Copperfield, were proposed and approved for multi-family development exceeding 2,000 market units (although neither site has, in fact, developed).

Lastly, defendant notes that although plaintiff has indicated its desire to build single-family rather than multi-family product, it has not shown that it is unable to build multi-family housing at its site.

In sum, defendant's argument regarding the issue of market considerations is that:

1) planning considerations strongly support the multi-family zoning in place for the original seven affordable housing sites within the Route 1 Corridor. The zoning provides for a variety of multi-family unit types as well as zero lot-line and patio homes—an attached unit type designed to supplement the standard multi-family unit types and increase the diversity of residential housing opportunities within a mixed-unit development.

2) High density development for the Route 1 Corridor sites, as defendant has planned, as opposed to conventional single-family development, is strongly supported by a series of planning considerations.

3) The sites in the Route 1 Corridor are accessible to jobs, resulting in shortened work trips, a goal of federal and state environmental legislation. They are also accessible to commercial and other services; transportation, including mass transit; and infrastructure, including a highly developed roadway system. These sites are most suitable for high-density development, and letting them be developed with conventional single-family homes

would be inconsistent with sound planning and would be an opportunity squandered.

4) The State Development and Redevelopment Plan designates this area of the Route 1 Corridor as Planning Area 2, a planned regional center in which development would be organized in a compact mode, thereby making public transportation options feasible and providing a variety of housing choices. The zoning scheme for the Corridor sites furthers these land use goals. It provides for high density housing, resulting in the compact form of development the State Development and Redevelopment Plan envisages. It also implements a balanced housing strategy by providing for a range of housing types, including a single-family type, which until recently has not often been produced in this area of the state, and which would serve a market above the multi-family market but lower than the single-family market generally served in this area, including in other portions of the Township. A broad range of households, income classes and lifestyle preferences (e.g., preferences for units necessitating little maintenance or for smaller units for empty-nesters or newly-formed households) will be served. The sites, particularly plaintiff's site, are ideal for multi-family, and there are a limited number of sites in the area—and certainly no others in the Township—that can be so described. Conventional single-family development on the sites would be inconsistent with the State Development and Redevelopment Plan.

5) Conventional single-family development on these sites would represent poor planning. It would result in a lower density not consistent with the notion of concentrating residential development in close proximity to jobs, services, and transportation. Nor would such development further a balanced housing strategy. Rather, it would undercut it by providing for more of the same kind of development as is witnessed in the central and southern parts of West Windsor, namely, large single-family houses, albeit here on smaller lots and at somewhat lower prices (plaintiff's representatives at the 1992 Planning Board hearings on its pro-

posal indicated that their prices would be in the $200,000 to $300,000 range). Defendant claims that multi-family product and zero lot-line and patio homes would be priced much lower than conventional single-family homes and would serve the income spectrum between those who are eligible for moderate-income housing and those who can afford conventional single-family housing.

Against this panorama of sharply conflicting expert views and arguments, this court finds that market considerations are relevant and explores a means of determining the real market.

## C.

The determination of market demand is influenced by several factors or indicators of potential market activity. These include assessments of data relating to particular uses, such as:

1) building permits issued;

2) the inventory of approved, unconstructed units (assessing the different stages of approval such as concept review, preliminary, final, permitted, and under construction);

3) zoning of vacant, unapproved land;

4) vacancy rates of previously constructed units;

5) recent experience as to absorption rates of units as they come onto the market; and

6) demographic data as to household growth, broken down by the age and income cohorts most associated with the market for the particular use under consideration.

Taken together, this information provides the basis for an assessment of the likely impact of market forces on the fair share plan during the compliance period. While any specific market study may be less reliable to the degree that it projects forward in time, market analysis of this nature is useful in assessing the reasonableness of a fair share plan. Data regarding recent building permit activity demonstrates actual development activity and,

presumably, developer confidence in the existence of a ready market for the product.

The number of approved, unbuilt units of any particular type demonstrates an anticipated inventory of the product that would compete with defendant's inclusionary developers, who are now "behind" in time. Proposals in a comparable status may also indicate future competing inventory. These numbers may suggest a lack of present or future demand for the product as the inventory increases or if it is stagnant and the product is not constructed for a considerable period of time.

The existence of land that is vacant, unapproved but zoned for a particular use, demonstrates the existence of a competitive inventory of such land and, potentially, a lack of developer interest. This is particularly true if the land has remained vacant as zoned for a considerable period of time.

Vacancy rates for a particular product demonstrate whether there is an existing over-supply of the product and whether the market is not absorbing the existing supply. This raises concerns regarding competition with any new product, as well as the potential lack of demand for the product.

Recent experience as to absorption rates demonstrates how the particular product is being received in the market place. Of related interest is the sales experience, including such indicators as unit price increases or decreases, developments that fail financially, auction sales and the like.

Lastly, demographic data as to relevant age and income cohorts reflect potential household growth or lack of growth among households most associated with the potential demand for a particular product and, therefore, the existence or lack of product demand.

One can evaluate the potential demand for a particular product, and one can make comparisons between two different products by using the data referenced above. In the context of defendant's fair share plan, the data can be utilized to establish the likely market for multi-family housing, as well as to compare that

market with the potential conventional, single-family detached market.

Plaintiff argues that all of the data, without exception, dramatically support the conclusion that the multi-family market is limited and questionable, while the single-family detached market appears relatively strong and predictable. Plaintiff suggests that this conclusion is supported by the following findings:

1) *Recent building permit activity:* Since 1990 only seven percent of building permits issued by West Windsor were for multi-family units. The ratio of single-family to multi-family permits was 13:1. The Mercer County multi-family permit percentage was only 25.4% or 4:1. Note that these multi-family figures do *not* factor out units occupied by households earning $50,000 or less—a particularly relevant group in the context of this case—as did defendant's market expert. If this cohort were factored out of the calculation, the multi-family share of the conventional market would likely be dramatically reduced to even smaller numbers.

2) *Inventory of approved, unconstructed units:* According to plaintiff's analysis of data contained in a report prepared by the Middlesex–Somerset–Mercer Regional Council (MSM), during a period from 1992–1993, multi-family units in the planning and development pipeline remained at a flat fifty-five percent to fifty-four percent of the total. Further, many of the multi-family projects counted by MSM were, in fact, projects with approvals that had been languishing for some time, were in distress and/or were essentially defunct. For example, the data included the Countryside (Toll) development as an active, approved multi-family project with 1,500 units, which it is not. The relatively high number of multi-family units in the pipeline, the distressed nature of these projects, and the fact that recent building activity has been for the single-family product indicates a substantial back-log of multi-family product with which any development in West Windsor, just starting out in the process, would have to compete.

3) *Inventory of vacant, unapproved land zoned for a particular use:* Defendant's compliance plan provides zoning for vacant, unapproved lands for the development of over 3,000 multi-family units. This is in the context of only fifty-two such units being built since 1990. Excluding units in the new PRRC zone, no inclusionary site permits the conventional, detached single-family product. Further, there are no lands zoned in West Windsor for small-lot, single-family detached housing outside of the inclusionary zones. There is a substantial inventory of lands zoned for multi-family housing that has yet to be approved and constructed, while lands zoned for single-family detached units are for either large-lot development or zero lot-line development, or exist in the PRRC specialty zone. This represents enormous potential competition in the multi-family market with little or no competition or even availability in the smaller lot, conventional single-family detached housing market. There is essentially no opportunity for the inclusionary developer to compete for the conventional, single-family detached market demand either on small or large lots.

4) *Vacancy Rates:* Becker cited an 8.7% vacancy rate as "low." However, this figure is for *all* units (consistent with Reading's approach) including single-family and multi-family products. The testimony and exhibits revealed the following facts:

a) There is a clear correlation between vacancy rates and product desirability;

b) Vacancy rates in the area of five percent were acceptable; over ten percent were high and indicative of a market problem;

c) The vacancy rate in West Windsor for single-family detached units is very low, approximately 4.5%; for multi-family it is very high, over 20%. In West Windsor, the vacancy rate for multi-family units is almost five times that of single-family detached units;

d) Similar data exists for Mercer County where the single-family vacancy rate is only 2.4% and the multi-family is almost

10%. The county vacancy rate for multi-family units is almost four times that of single-family units;

e) The same trend existed for the municipalities covered in Becker's primary market area where the single-family detached vacancy rate is only 3.6% and the multi-family is over 14%; a multiple of almost four times the single-family rate;

5) *Recent experience on absorption rates:* This testimony and data reveals that the single-family product is being absorbed into the marketplace at a much faster rate than the multi-family product.

Considering the inventory of product and building permit activity that substantially favors the single-family product, this court concludes that the current market supports the single-family product. Becker indicated that several of the multi-family projects were in distress, had been the subject of foreclosures or Resolution Trust Company acquisition, had significantly lowered prices or had resorted to auction techniques to market units. He acknowledged that these were not good signs for the financial success of the developments. This was not true of the single-family product. His own analysis of absorption rates in West Windsor since 1990 is that a total of only fifty-two multi-family units were built, all in one year. The single-family detached market showed annual absorption rates that were three to five times that rate in any given year and thirteen times the multi-family rate since 1990; and

6) *Demographic data as to household growth categorized by age and income cohorts associated with different products:* Becker characterized households most attracted to the multi-family market as those aged 25 to 34, 55 to 69 and earning incomes of under \$75,000. However, the data reveals that these cohorts are, in fact, shrinking and will quantitatively decline during the fair share period. This held true even when Becker countered that the demand for the multi-family product in inclusionary developments might also come from households in the 35 to 54 age bracket. The under–\$75,000 cohort in that age bracket also would decline

quantitatively between 1994 and 1999. On the other hand, the age and income cohorts associated with detached single-family housing would rise. The $75,000 to $99,000 cohort increases by thirteen percent (from 930 to 1,050), and the $100,000 + cohort increases by over forty-three percent (from 2,600 to 3,730). Defendant's plan, relying as it does on the multi-family market, is relying upon the needs of an age and income cohort that is shrinking, while failing to take advantage of the needs of a cohort that is expanding.

Based on all of these factors, plaintiff suggests that a fair share plan that does not take advantage of the demand for the conventional, single-family detached product cannot be sanctioned, when that product has been a dominant force in the market place and will continue to be so throughout the compliance period, and when it is not likely that the mechanisms utilized, which eschew the conventional, single-family detached product, will achieve compliance within the compliance period.

Defendant does not object to the factors utilized by plaintiff as indicators of market activity but suggests, without example, that additional factors are relevant. In addition, defendant's counter-argument suggests that the factors utilized lead to speculation and cannot serve as a sound basis for determining future market demand. Defendant also argues that plaintiff is empirically wrong. There are many approved but unbuilt large-lot, single-family units that have not been absorbed, and the proofs fall far short of establishing that the market for small-lot, conventional single-family homes will yield West Windsor's fair share of affordable housing.

■ This court finds that the testimony presented by both parties leads to the conclusion that the present cycle period of the market calls for greater use of single-family dwellings as part of the product available for inclusionary sites. An analysis of the competing experts' data and opinions supports the view that the over-reliance on multi-family housing as the method of producing inclusionary housing has had only limited success in the past and

has questionable viability in the future. Clearly, the housing demographics for West Windsor have changed during the past cycles and changes will continue into the future. A municipality must respond to these changes if it is to fulfill its affirmative obligation to provide a realistic opportunity for inclusionary development. Defendant argues that these changes and shifts are not suitable as a basis for long-range planning as they may be only temporary in nature. The solution, however, is not to deny market realities through ordinance limitations, which by their very nature artificially constrain the market. Rather, the solution is to provide flexibility and opportunities in the ordinances that would allow for market responsiveness and adjustment in order to achieve the ultimate objective of constructing inclusionary housing.

The court's expert, John J. Lynch, summarized the issue succinctly when he noted in his report:

With the emphasis in the new COAH Rules on creating opportunities for the market to effectively provide affordable housing in inclusionary developments, there are certain provisions in the West Windsor ordinances which appear to artificially constrain the market without a corresponding public benefit. West Windsor deserves high marks for creating a wide range of housing opportunities within its affordable housing zones. At the same time, its housing type and mix requirements can be counter-productive. In spite of the range of housing types permitted, the single-family detached dwelling with two side yards is not permitted while the zero lot-line and patio home configurations are. At similar development densities, these housing types are essentially similar from a public health, safety and welfare perspective. If the districts which permit small-lot, single-family zero lot-line dwellings offered the flexibility of the "conventional" single-family dwellings, there would be a greater likelihood of the market responding, as evidenced by the willingness of the Plaintiff to pursue this housing type through litigation.

The required housing mix found in certain of the zoning districts also can create market constraints. In the testimony by the potential developer of Parcel B, for example, he indicated that he was not happy with the requirement that he build no more than 80 percent of his market units in any one housing type. His interests were only in the garden apartment product and not in townhouses or other products permitted. Similarly, Plaintiff has indicated that the mix required in the PRM–I zone alters the product which they feel is marketable and introduces a second product into the development which is of little or no interest to the developer. The mandatory mix may force developers into a segment of the market which they do not want to address, and where this occurs it adversely affects the production of housing.

By allowing an expanded choice of housing product and eliminating the mix requirements, the market should be more able to effectively produce the affordable housing units required. While some of the steps which could be taken to overcome these market issues could be accomplished in remediation, their constraints on housing development could be considered as potential contributors to reduced housing development, and on the "reasonable probability" test for compliance could allow for a finding that the plan adopted by the Township is non-compliant.

In sum, this court is convinced that West Windsor's ordinances, as drafted, restrict the opportunity to develop its inclusionary sites by failing to adequately reflect the actual and anticipated market demand for various types of housing for inclusionary developments.

Some caution must be noted. The endorsement and recognition of affordable, small-lot, single-family detached housing unconstrained by artificial restrictions, e.g., the zero lot-line requirement, should not be interpreted as condoning a return to the large-lot, single-family dwellings that have historically been condemned as an exclusionary device. The product that must be permitted by defendant is an *affordable* product (in the common sense of the word) that will stimulate the construction of additional affordable housing consistent with the *Mount Laurel* doctrine. Municipalities and developers must not construe this result as a license to regress and abandon the basic constitutional underpinnings of *Mount Laurel*. The use of appropriate market products—here single-family dwellings—must be viewed not as a return to the past, but an impetus for growth in the future.

## V.

[Section V. Deals with a factual analysis of each affordable housing site. This section is redacted.]

## VI.

Chief Justice Wilentz said, "[w]e may not build houses, but we do enforce the Constitution." *Mount Laurel II, supra,* 92 *N.J.* at 213, 456 *A.*2d 390. The *Mount Laurel* doctrine has been part of the jurisprudence of this state for over twenty years. The courts

of this state cannot tolerate a mere feint towards compliance. While historically large-lot zoning was an effective exclusionary device, the new weapons have become more sophisticated. Zero lot-line requirements and "front ending" sewer costs, to name but two, which may prove to be effective and responsible zoning tools in other contexts, when joined together have the cumulative effect of both a) barring the ability and incentive of developers to come forward to build the necessary housing and b) allowing municipalities to avoid compliance not simply with a "housing requirement" but with the constitution of this state.

This court's recognition of market considerations and the potential use of appropriately priced single-family dwellings as a viable alternative to stimulate construction of *Mount Laurel* housing represents an irony in the *Mount Laurel* legacy. As previously noted, multi-family dwellings represented the *Mount Laurel* housing of choice; single-family dwellings suggested exclusionary zoning. The holding today cannot be viewed as a retreat but as a stimulus to move forward. This court does not envision large-lot, high-priced single-family units as a substitute for the appropriately priced, smaller-lot single-family units that are conducive to integration with *Mount Laurel* housing.

Defendant's affordable housing plan is woefully inadequate and, unless amended, surely will not yield West Windsor's fair share of housing for low and moderate income families. Defendant is not in compliance with the *Mount Laurel* mandate, and thus is in violation of the New Jersey Constitution and the New Jersey Fair Housing Act.

 Where a trial court determines that a municipality's zoning fails to satisfy its *Mount Laurel* obligation, it shall order the defendant to revise it. *Id.* at 281, 456 *A.*2d 390. The trial court may appoint a special master to assist municipal officials in developing constitutional zoning and regulations. The court may also order a builder's remedy.

 The builder's remedy is a device that rewards a plaintiff seeking to construct lower income housing for success in bringing about ordinance compliance through litigation. *Allan–Deane Corp. v. Bedminster Tp.*, 205 *N.J.Super.* 87, 500 *A.*2d 49 (Law Div.1985). Where a developer-plaintiff succeeds in *Mount Laurel* litigation and proposes a project providing a substantial amount of lower income housing, that developer should be granted a builder's remedy unless the proposed project is clearly contrary to sound land use planning. *Mount Laurel II, supra,* 92 *N.J.* at 279–80, 456 *A.*2d 390. The remedy should be carefully conditioned to ensure that the plaintiff-developer in fact constructs a substantial amount of lower income housing. *Id.* at 281, 456 *A.*2d 390. Various devices can be used for that purpose. *Ibid.*

 Both of these remedies are appropriate here. There is no question that plaintiff-developer Toll Brothers has succeeded in this *Mount Laurel* litigation, and has proposed to develop its land in such a way as to produce a setaside of at least fifteen percent affordable units. Plaintiff is entitled to a builder's remedy.

At the conclusion of trial this court indicated that the resolution of a specific builder's remedy would be addressed after this court ruled on compliance. There are aspects of plaintiff's specific proposal for Site 6 that bear review, however, such that the court can condition the remedy in a manner that will assure the benefit designed to flow from the development of affordable housing. Specifically, the following issues shall be addressed:

1) The appropriate density of plaintiff's proposed small lot conventional single-family homes;

2) The appropriate setaside: plaintiff has proposed a setaside of fifteen percent—this may not be sufficiently substantial, depending on the ultimate density;

3) Funding the costs of infrastructure: plaintiff seeks to avoid "fronting" all the costs of an expensive oversized system—allocation of the costs must be resolved; and

4) Application of the anti-look-alike ordinance: plaintiff has asserted that the ordinance increases costs.

This court is particularly concerned with plaintiff's proposed pricing of the market units: $200,000 to $300,000 homes may not provide the answer to defendant's non-compliance. Also of special concern is the proposed age-restricted nature of the affordable units. There is considerable regional need for unrestricted units, and, considering recent approvals in West Windsor, there may already be adequate affordable senior housing "in the pipeline".

But these are matters that will be addressed as this case proceeds forward. Following a ruling on the builder's remedy, this court will retain jurisdiction over remediation of defendant's housing plan as a whole, including the appointment of a special master.

This court concludes that defendant's inclusionary zoning plan is not in compliance with the requirements of *Mount Laurel II* and is unconstitutional.